## J. WILLIAMS v. THE STATE.

1. WITNESS.— Children or other persons who, when examined by the court, appear not to possess sufficient intellect to relate transactions with regard to which they are interrogated, or who do not understand the obligation of an oath, are declared incompetent as witnesses by the Code of Procedure.

2. SAME — PRACTICE.— The method of testing the competency of such witnesses is confided to the discretion of the trial judge, and his determination of the question will not ordinarily be disturbed on appeal unless an abuse of that discretion is apparent.

3. SAME — FACT CASE.— See the facts of the present case for a trial in which a child of nine years of age disclosed both mental and moral incompetency to testify.

Appeal from the District Court of San Augustine.
Tried below before the Hon. P. F. Edwards.

Jule Williams, the appellant, was charged by the in-
dictment with the offense of rape upon Mandy Burrell, a
female under the age of ten years, on June 24, 1881.
Both of those parties and most of the witnesses were
negroes. The jury found the appellant guilty and as-
sessed his punishment at a term of five years in the
penitentiary.

Mandy Burrell, for the State, was the only witness who
testified to the perpetration of the outrage and imputed
it to the appellant. When presented by the prosecution
the defense objected to her examination until her compe-
tency as a witness should be shown. Under direction of
the court the counsel for the State proceeded to inter-
rogate her upon *voir dire*, when, as shown by the bill of
exceptions reserved to the ruling of the court sustaining
her competency, she testified as follows:

"I am nine years old; went to school once about five
months; know my A, B, Cs. Think I ought to be hung
if I don't tell that Jule done it. Don't know what would
be done to me if I didn't tell the truth; don't know what
taking an oath or swearing is; don't know what I said
when I held up my right hand just now." (Here the court
ordered her to be sworn again, which was done by the
clerk. Counsel for defendant then, by permission of the
court, examined witness further, and she testified as fol-
lows): "I don't know what swearing or taking an oath
means. I only know I came here to swear against Jule."
The court then examined the witness further, as follows,
viz.: "Did you ever say your prayers?" "Yes, sir."
"Who did you say them to?" "To ma." "What did
you say them for?" "I don't know." Whereupon the
court ordered her to hold up her right hand, and admin-
istered the following as an oath to the witness: "Do you
swear, promise me, that in what you say about this case

you will tell the truth, the whole truth, and nothing but the truth?" The witness then answered as follows: "I don't know what telling a lie is; I don't know what telling a story is." "Did your ma never whip you for telling stories?" "Yes, sir." "Would you be hurt,—anything be done to you,—if you told anything on Jule (the defendant) which was not true?" "I don't know, sir." "Was you ever told that if you told a lie that anything would be done to you after you was dead?" "They told me the bad man would get me." "Do you know what would be done to you by the law, while you are living, if you tell a lie in this case on Jule?" "No, sir." "Don't you think it wrong to tell a story or a lie?" "I don't know." Being asked if it was right to tell the truth, she answered "yes," once or twice; and being asked whether it was right or wrong to tell the truth, her answer would be "no,"—conveying no apprehension of the question. Being asked the difference between a lie and the truth, she said she didn't know. Being asked what the truth was, and a lie was, she said she didn't know. Here the court directed the jury to be carried away from the court-room, which being done, the court directed the examination of the witness to proceed as if the jury was present; whereupon the witness was examined as in chief by the district attorney, and answered as follows, viz.:

"I am Mandy Burrell; I was nine years old two months before Christmas. I know Jule Williams. (She then pointed out defendant.) I lived on Mrs. Sneed's place last year, about a mile this side of Mrs. Sneed's house. It is seven miles to where I lived; it was in San Augustine county. Jule Williams came to the door of the little room of our house on the 24th of June of last year, and stepped up in the door and asked me where ma and pa was. I told him they was over in the field, at work. There wasn't nobody in the room with me but my little sister Rose, and little Judge and the baby. I had the baby in

my arms and was sitting in the swing. Jule came up to me and took hold of me with one arm and took the baby in his other arm, and then he throwed me down on the floor and pulled up my clothes and put his peter in me. I told him not to do that, he was killing me; but he wouldn't quit and kept on till he ruined me. He then got up and I got up, and he told me if I wouldn't tell nobody he would give me a big roll of candy; but I didn't care bout that air candy. Jule then got out at the chimney and went down to a big gully and got in that, and then went down it to the woods, and then went on through the woods to the big road, and then went on to Mrs. Sneed's. I went out at the door and started to the field to tell ma and pa, but I met my little brother Lon coming to the house to feed the calves, and I told him to go back to the field and tell ma and pa Jule had been there and ruined me, and for them to come to the house. But they didn't come till sundown, and I told them what Jule had done to me. I was brought up here to town the next Tuesday, and Dr. Frank Tucker examined me.

(Cross-examined.) " I just laid in the bed that evening and the next day and Sunday, and didn't go nowhere out of the house. I didn't go to Abe Roberts's next morning or any time next day. I just laid about all day; didn't go to Jake Roberts's next day to get irons; didn't go back in the evening to carry such irons home. My brother Lon went after the sad-irons, and took them home. Jule done it to me on a Friday evening; it was the 24th of June. It was in San Augustine county. Ma told me to say it was the 24th of June. She told me to say it was San Augustine county. She told me to say that about the candy. Pa told me to say it was seven miles from town. Ma has talked to me about it and told me what to say, a heap of times. She told it to me the last time last night, at home. Pa told me last night, too; they told it all over to me, and told me what to say. I don't know what an oath is; I

don't know what swearing is; I don't know what would be done with me if I told a lie on Jule, or told a story on him. I don't know what the clerk said to me when I held up my hand to him. I don't know what the judge said to me when I held up my right hand to him.

(Re-examined by the State.) "Did your ma tell you to tell the truth or a story on Jule when you came up here ?" "She didn't tell me that." (Re-crossed.) "Yes, ma told me to say it was the truth if they asked me that."

The bill of exceptions proceeds as follows: "Here the court directed the sheriff to take charge of the witness and keep her separate from the other witnesses, and to bring the jury again into court; which being done, the court directed the district attorney to proceed with the examination of other witnesses for the State, and it would hold under advisement the question of said witness's competency to testify until all other State's witnesses had been examined. The examination of other State's witnesses occupied the remainder of the day and a portion of the following morning session of the court, when, the examination of all the other State's witnesses having been concluded, the district attorney again presented the said witness Mandy Burrell, who had, since her above-stated examination, remained in charge of the sheriff, away from the court-room and other witnesses, and been permitted to speak to no one about the subject of her examination, and she was again sworn in due form of law. Whereupon the defendant by his counsel objected to the said witness being permitted to testify, because it appeared, after the foregoing examination of said witness by the court and under its direction, that said witness was not competent to testify, and did not possess sufficient intellect to relate transactions with respect to which she was interrogated, and did not understand the obligation of an oath; which objection the court overruled, whereupon the defendant excepted," etc.

By the statement of facts the testimony of this witness is given as follows: "Mandy Burrell (colored), a witness for the State, being fully instructed by the judge presiding of the nature and obligation of an oath and the pains and penalties of perjury in life and after death, testified before the jury as to the facts and circumstances of the alleged offense as set out in defendant's bill of exceptions number one; and in addition thereto she testified as follows, viz.: 'I told ma and pa about what Jule had done to me, when they came home at sundown on Friday evening, and me and the other children kept on telling them about it that night and all the next day (Saturday), but they wouldn't pay no attention to us. They didn't examine me until Sunday morning; neither of them pulled up my clothes or looked to see what was the matter with me until Sunday morning. While Jule had me down on the floor and was ruining me, I was hollering and telling him he was killing me, and my sister Rose and little brother Judge was beating on him with sticks. I don't think it is any worse to tell what ain't the truth on Jule now, after holding up my right hand to the judge, than it would be to tell what wasn't the truth anywhere else, or at home to my ma, when I have not held up my right hand. I don't know what day of the month last Christmas came on; I don't know what day of the month the 4th of last July was. Ma told me to say that it was the 24th of June; she told me to say that about the candy. She has told it all over to me a heap of times; she told it to me the last time the night before we came up here. She told me to say it was the truth."

Eliza Roberts, colored, testified for the State that she was the wife of Abe Roberts, and lived two or three hundred yards from where Judge Burrell, the father of Mandy, lived during the year 1881. About twelve o'clock on the Friday when the commission of the offense is alleged, the defendant came to witness's house, and

stayed there until the household were ready to go to their work, and then he left to go back to Mrs. Sneed's. In going to Mrs. Sneed's from witness's house, the way led by Judge Burrell's, and the last seen of defendant by the witness on the day in question he was going in the direction of Judge Burrell's.

On her cross-examination the witness stated that it was between one and two o'clock when the defendant left her house. Witness heard of nothing being the matter with Mandy until the Sunday next after the Friday of which she had spoken. That Sunday morning, as witness was returning home by Judge Burrell's from Mrs. Sneed's, she was told at Burrell's that Mandy had been raped and badly injured. Witness went into Burrell's house, and, with two or three other women, laid Mandy on her back and made a close examination of her privates, but could see nothing the matter with them. While there the witness was told by Virginia Burrell, Mandy's mother, that she knew nothing about it until that morning, and had not examined Mandy until then. On the previous day Mandy came to witness's to borrow flat-irons. She waited a while for them, and played as usual with witness's children, and witness saw nothing then the matter with her.

Judge Burrell, colored, for the State, testified that he had known the defendant six or seven years. The witness gave a description of the house he lived in and its surroundings. He stated that about noon on the 24th of June, 1881, the defendant stopped at the house of witness about half an hour and then went on in the direction of Abe Roberts's. Between one and two o'clock, the witness, leaving his wife and the children at the house, went to his work in a field 250 or 300 yards from the house. In a half an hour or so his wife and their son Lon came to the field to work. Later in the evening witness sent his son Lon to the house with some hay for the calves.

Lon returned after a while and said something about the defendant doing something to Mandy, who was witness's daughter, about nine years old. Witness and his wife paid no attention to what Lon told them, but worked on until about sunset, and then went to the house. When they got there Mandy told them what the defendant had done to her, and said he had ruined her. She was lying down on the bed, and could hardly walk. Witness and his wife then examined her, and "found her tore up mighty bad." They examined her well that evening. The next day, Saturday, she lay about all day, but witness and his wife told nobody about the matter until Sunday morning; and on that day witness went to the county site to have the defendant arrested. The next Tuesday, witness took Mandy to Dr. Tucker, who examined her. About a week before that the witness and the defendant were at Mrs. Sneed's horse-lot, and the defendant was complaining of a "hurting and running 'rangement," which witness understood to be the clap. Defendant limped and walked spraddle-legged. Witness thought Mr. Bob Thompson was present when defendant told witness about his complaint. On the Sunday following the Friday in question witness did not see Mr. Bob Thompson at witness's house, nor tell him there or anywhere else that he, witness, did not before that morning hear or know of anything being the matter with Mandy, and had made no examination of her until that morning.

Virginia Burrell, the wife of Judge, testified for the State, and gave much the same account as his of the condition in which they found Mandy the evening of the Friday in question. She also stated that Mandy lay in bed all of the next two days, and denied that Mandy went to Abe Roberts's or anywhere else during that time. Witness also denied seeing Mr. Bob Thompson on the Sunday after Mandy was injured, and denied hearing or taking part in any conversation with him wherein he was told

by her and her husband that they had only that morning found out about anything being the matter with Mandy, and had not examined her until that morning.

Dr. Tucker, a white physician, for the State, testified that on Tuesday, June 28, 1881, the girl Mandy was brought by her father for treatment by witness, who, on examining her generative organs, found them bruised, swollen, and beginning to suppurate. There was a slight rupture of the hymen and also of the delicate membrane at the posterior end of the mouth of the vagina. Suppuration from such injuries usually supervened in from three to five days, but might be accelerated by uncleanliness, hot weather, or a bad condition of the blood. Witness next saw Mandy about eight days after his first examination, and then found her suffering from a well-developed case of gonorrhea, popularly known as clap. That disease usually appears in from six to twelve days after infection, but inflammatory symptoms may be felt as early as the third or fourth day. For several weeks before witness saw Mandy he had been treating for gonorrhea a number of negro men in the neighborhood of Mrs. Sneed's farm; but he had never treated the defendant. This testimony concluded the evidence for the State.

Abe Roberts, for the defense, testified that he had known the girl Mandy Burrell since she was very small. On the Saturday next after the Friday on which she was said to have been injured, she came to witness's house to borrow some irons. Witness's wife was using the irons, and Mandy waited for them some time, and while waiting she played about the yard with witness's children, and ran a foot-race with one of them. In the evening she brought the irons back. Witness noticed nothing the matter with her that day. The next day, Sunday, he heard at Judge Burrell's that the defendant was accused of having raped Mandy the previous Friday evening, and when witness was told this he thought about how well Mandy was at his house the day before.

Robert Thompson (white), for the defense, stated that he was the grandson of Mrs. Sneed, and manager of her farm and business. At the alleged time of the offense the defendant had been working for witness for about two weeks. In the forenoon of the Sunday next after the Friday on which the offense was alleged witness first heard of it, and in the afternoon of the same day he went to Judge Burrell's and inquired of Judge and his wife about the matter. They told witness in substance that the outrage had been committed the previous Friday evening, but that they knew nothing of it until that (Sunday) morning, when, as Mandy was looking badly and complaining, they made her tell what was the matter, and she told them that the defendant had done it the Friday before, and then, they said, they examined Mandy's privates and found her badly injured. Both Judge and his wife Virginia were present at this conversation, and both took part in it. While it was going on between them and the witness, Mandy was sitting in the yard nursing the baby.

The previous testimony having introduced the question of gonorrhea *vel non* as an issue in the case, the defense elicited from the witness the circumstances under which the defendant made profert of his penis to the witness for the purpose of vindicating its hygienic *status*, which was questioned on account of the gonorrhea prevalent in the neighborhood. From a close ocular inspection of the aspersed member, the witness pronounced its vindication complete. This episode occurred in the afternoon of the same Friday on which the outrage on Mandy was alleged to have been committed.

Pressing this line of investigation a step further, the defense introduced a young colored lady, who testified that she never had sexual knowledge of the defendant but once, and that was in the night of the Saturday succeeding the Friday of the alleged outrage on Mandy; and that she had no gonorrhea either before or since that ex-

periment. With this satisfactory specimen of a "negative pregnant," the evidence was concluded.

No brief for the appellant.

*H. M. Holmes*, for the State.

WHITE, P. J. With regard to persons who are declared to be incompetent to testify on criminal trials in this State, our statute names "children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with regard to which they are interrogated, or who do not understand the obligation of an oath." Code Crim. Proc. art. 730, subdiv. 2. It is now said to be the established rule as well in criminal as in civil cases, that children of any age are competent to testify and may be examined upon oath if capable of distinguishing between good and evil, whenever they show intelligence enough to observe and narrate transactions, or where they have a due sense of the obligation of an oath,— that is, possess sufficient knowledge of the nature and consequences of an oath. 1 Phill. Ev. C. H. & E. Notes, p. 11; 1 Greenlf. Ev. 367; Whart. Crim. Ev. (8th ed.) § 366.

The mode of eliciting and determining by examination the fact of competency is left to the sound discretion of the judge; and when the exercise of that discretion has been called in question, it has been more than once declared by this court that "we believe that the court before whom the examination of a child offered as a witness is made is better able to determine as to its competency to testify than this court can possibly be from the bare transcript, and we would not feel warranted in reversing a conviction had on account of the admission of such testimony unless it was made clearly to appear that the discretion of the court had been abused." *Brown* v. *State*, 2 Texas Ct. App. 115; *Ake* v. *State*, 6 Texas Ct. App. 398; *Brown* v. *State*, 6 Texas Ct. App. 286.

Mr. Starkie says that whether the infant be competent

or not is a question for the discretion of the court.
2 Stark. Ev. 393.    We are aware that the soundness of
this doctrine has been called in question by the Supreme
Court of Alabama, in *State* v. *Morea*, 2 Ala. 275, wherein
it is said, "it may not be improper to add that we incline
strongly to the impression that the admission or rejection
of all evidence is not a matter of mere discretion, but
rather that all such questions involve rights which must
be ascertained and determined by fixed principles and by
rules of law.    We are not aware of any adjudicated case
which tends to support Mr. Starkie in the contrary opin-
ion."    In his work on Criminal Evidence (8th ed.), Mr.
Wharton says, "the preliminary examination thus requi-
site is usually undertaken exclusively by the court, and
it is said that it will require a strong case to sustain a
reversal of the ruling of the court examining such a wit-
ness."    Sec. 368.

In the case before us the learned judge appears to have
entertained serious doubts of the competency of the pros-
ecuting witness, Mandy Burrell, both as to her intelligence
and her sense of the nature, consequences and obligations
of an oath.    She was nine years of age, it is true, and
yet her examination discloses an utter want of anything
like a knowledge of the nature or character and conse-
quences of the oath she had taken as a witness.    As to
the narrative she gave of the transaction, she stated that
the facts she was to testify to had been rehearsed to her
time and again by her parents, and she had been in-
structed by them what to testify.    From the examination
of the witness on her *voir dire*, as shown by defendant's
bill of exceptions (which the Reporters will give in full),
we are of opinion that the witness showed herself wholly
incompetent to testify under our statute, and that the
court erred in permitting her to do so over defendant's
objections.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*